# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
UNITED STATES OF AMERICA            :
                                    :          Hon. Claire C. Cecchi
                                    :
v.                                  :          No. 23-CR-00891
                                    :
                                    :
JEYAKUMAR NADARAJAH                 :
                                    :
          Defendant.                :
                                    :
_____

**United States' Response in Opposition to Defendant's Fifth Motion to Dismiss**
**(ECF No. 75)**

GLENN S. LEON
Chief, Fraud Section
Criminal Division, Department of Justice

John J. Liolos, Trial Attorney
Amanda Fretto Lingwood, Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Tel.: (202) 768-2246

Table of Contents

Background ....................................................................................................... 2

Argument......................................................................................................... 6

I.  The Defendant's speculation that pretrial publicity has "irreparably" prejudiced the jury pool is unfounded and premature. ........................................ 7

  A. Pretrial publicity legal standard.......................................................... 7

  B. Speculations of prejudice can be addressed in voir dire................................ 11

II. The TD DPA and its common provisions do not violate the Constitution or amount to prosecutorial misconduct.................................................... 19

  A. A deferred prosecution agreement is similar to a plea agreement and is a common device in corporate criminal prosecution. ....................................... 19

  B. Witness interference constituting prosecutorial misconduct requires a strong showing of actions taken with deliberate intent to distort the judicial factfinding process that actually prejudice the defendant. ............................ 21

  C. The DPA and its routine contents do not violate the Constitution or amount to prosecutorial misconduct. ............................................................. 23

Conclusion...................................................................................................... 31

# Table of Authorities

## Cases

*Estes v. Texas,*
    381 U.S. 532 (1965) …………………………………...…………………….13

*Flamer v. State of Del.,*
    68 F.3d 736 (3d Cir. 1995)…………….……………………...……………….13

*Gov't of the V.I. v. Fahie,*
    419 F.3d 249 (3d Cir. 2005)……………………..…………………...……22, 29

*Holves v. Ferguson,*
    3:20-cv-05718, 2021 WL 1601310 (W.D. Wash. Feb. 17,2021)………….…...24, 29

*In re Tsarnaev,*
    780 F.3d 14 (1st Cir. 2015)………..…….………………..……………….......14

*Lambert v. Blackwell,*
    387 F.3d 210 (3d Cir. 2004)……...…………………………...…………….21

*Marshall v. Hendricks,*
    307 F.3d 36 (3d Cir. 2002)……..……………….……………………………….21

*Martin v. Warden, Huntingdon State Corr. Inst.,*
    653 F.2d 799 (3d Cir. 1981)………..…………………………………………….8

*Nebraska Press Assn. v. Stuart,*
    427 U.S. 539 (1976)………………...…………………………………………7

*Patton v. Yount,*
    467 U.S. 1025 (1984)…..………………………....…....……………….7–8, 14

*Rideau v. Louisiana,*
    373 U.S. 723 (1963)………………...…………………………….........13

*Sheppard v. Maxwell,*
    384 U.S. 333 (1966)……………………………………………….........13

*Skilling v. United States,*
   561 U.S. 358 (2010)……………………………………………………7, 13–14

*Trantino v. Hatrack,*
   408 F. Supp. 476 (D.N.J. 1976)……………………………………..….........9, 11

*United States v. Addonizio,*
   313 F. Supp. 486 (D.N.J. 1970)…...........……………………………………....12

*United States v. Capo,*
   595 F.2d 1086 (5th Cir. 1979)……………………………………………..8

*United States v. Cerilli,*
   428 F. Supp. 801 (W.D. Pa. 1977)…...…………………………………….....7

*United States v. Claxton,*
   766 F.3d 280 (3d Cir. 2014)………...………………………….…8–9

*United States v. De Peri,*
   778 F.2d 963 (3d Cir. 1985)………...…...…………………………….…...9, 13

*United States v. Derrick,*
   163 F.3d 799 (4th Cir. 1998)……………………………...……....……...22

*United States v. Deutsche Bank Aktiengesellschaft,*
   No. 20-cr-584  (E.D.N.Y. Jan. 7, 2021)……..……………..……...……………23

*United States v. DiSalvo,*
   34 F.3d 1204 (3d Cir. 1994)……………………………….………....10–11

*United States v. Evans,*
   No. 3:CR-19-09, 2021 WL 5847134 (M.D. Pa. Dec. 9, 2021)…...…………..…….....22

*United States v. Freepoint Commodities LLC,*
   No. 23-cr-224 (D. Conn. Dec. 14, 2023)………...………….………………...23

*United States v. Garcia,*
   519 F.2d 1343 (9th Cir. 1975)……………………...…...……………….……19

*United States v. Goldman Sachs Grp. Inc.,*
   No. 20-cr-437 (E.D.N.Y. Oct. 22, 2020)…...……...………...……………...23

iv

*United States v. Grace,*
    401 F. Supp. 2d 1057 (D. Mont. 2005)……………...………………………..........10

*United States v. Haldeman,*
    559 F.2d 31 (D.C. Cir. 1976)………………..……………………………...…….15

*United States v. Herman,*
    589 F.2d 1191 (3d Cir. 1978)……………..………………………………….....21

*United States v. Hwa,*
    No. 18-cr-538, 2021 WL 11723583 (E.D.N.Y. Sept. 3, 2021)………...…..........25–26

*United States v. Jafari,*
    No. 12-cr-475, 2012 WL 5335242 (D.N.J. Oct. 26, 2012)…………...…..…...........22

*United States v. JPMorgan Chase & Co.,*
    No. 20-cr-175 (D. Conn. Sept. 29, 2020)……………...………………………..23

*United States v. Lebedev,*
    932 F.3d 40 (2d Cir. 2019)………………..……………………………….........26

*United States v. Lovecchio,*
    561 F. Supp. 221 (M.D. Pa. 1983)………...………...…………………………..8

*United States v. Morrison,*
    535 F.2d 223 (3d Cir. 1976)……………..………...………………...................29

*United States v. Parrish,*
    No. 4:20-cr-124-17, 2022 WL 662306 (S.D. Ga. Mar. 4, 2022)….……....……...10, 17

*United States v. Perryman,*
    No. 12-cr-123, 2013 WL 4039374 (E.D.N.Y Aug. 7, 2013)………..…….............17–18

*United States v. Phillips,*
    874 F.2d 123 (3d Cir. 1989)………………………...……………………...20, 29

*United States v. Quinn,*
    728 F.3d 243 (3d Cir. 2013)………………………...…………………………....21

*United States v. Ramirez,*
    No. 12-cr-10089-03, 2019 WL 3801676 (D. Kan. Aug. 13, 2019)………............20, 29

*United States v. Ruchlewicz,*
    610 F. App'x 204 (3d Cir. 2015)...…………….…………………….………...10, 17

*United States v. Saena Tech Corp.,*
    140 F. Supp. 3d 11 (D.D.C. 2015)……………………....……………….…..19

*United States v. Sain,*
    141 F.3d 463 (3d Cir. 1998)……………....……………………………..……...30

*United States v. Santos,*
    No. CR 18-585, 2022 WL 1698171 (D.N.J. Mar. 22, 2022)………………………21

*United States v. Splain,*
    545 F.2d 1131 (8th Cir. 1976)……………………………..……….…………..17

*United States v. Stein,*
    No. 05-cr-0888, 2006 WL 1063295 (S.D.N.Y. Apr. 5, 2006)………......…..…..26–28

*United States v. TD Secs. (USA) LLC,*
    No. 2:24-cr-623 (D.N.J.)………………….…..……..…………………… 2–3, 5

*United States v. Wecht,*
    484 F.3d 194 (3d Cir. 2007)…………..……………....…....……………………...18–19

*United States v. Whiteside,*
    391 F. Supp. 1385 (D. Del. 1975)……………….…....…………………….….. 7

*United States v. Wright,*
    913 F.3d 364 (3d Cir. 2019)……………….…..……………………....22, 31

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003)……………….…....…………………..……………...14

*United States v. Yu Xue,*
    No. 16-22, 2018 WL 3647900 (E.D. Pa. Aug. 1, 2018)……...……..……..……….21

**Other Authorities**

D.N.J. L. Civ. R. 7.2(d)……………………………………………………………..6

D.N.J. L. Cr. R. 1.1…………………………………………………………...6

D.N.J. L. Cr. R. 101.1……………...……………………………………………16–17

U.S. Dep't of Justice, Justice Manual,

    § 9-28.010…………………………………………………………..……………6

    § 1-7.001…………………………………………………………………..……10

The Defendant's Fifth Motion to Dismiss ("Mot.," ECF No. 75) seeks extraordinary relief in ordinary circumstances: to dismiss an indictment after a charged partner in crime publicly admitted to the alleged scheme. Attempting to justify such exceptional relief that is contrary to law, the Defendant makes two central claims.

*First*, the Defendant asserts the existence of speculative, unfounded jury prejudice arising from pretrial publicity, which can be explored and (if necessary) cured in voir dire. The Defendant does not address or even acknowledge that simple solution pervasive in the caselaw. Courts routinely deny pretrial publicity motions seeking less extreme relief in circumstances with far more potentially prejudicial pretrial publicity.

*Second*, the Defendant argues that the routine form and content of TD Securities (USA) LLC's Deferred Prosecution Agreement itself prejudices the Defendant, and amounts to prosecutorial misconduct by witness interference. But such agreements with corporate employers while related cases against former employees are pending are routine occurrences. The Defendant makes no required showing of a deliberate intent to distort the judicial factfinding process by the Department accomplishing a routine corporate resolution. Nor could the Defendant, because there was no such intent. Courts have rejected similar arguments in similar circumstances, as should this Court.

The Fifth Motion's hollow hyperbole intensifies the Defendant's growing theme of asking this Court to grant relief contrary to the caselaw to avoid a trial on the merits. Consistent with the weight of authority and facts of this case, the Court should deny the Motion.

## Background

     This case charges Defendant Nadarajah with a scheme to "spoof" or manipulate the secondary market for United States Treasuries in order to defraud other market participants from approximately April 2018 through May 2019.[1] In connection with the November 8, 2023, unsealing of this Indictment, the Department of Justice issued a press release, included as Exhibit 1. The release detailed the allegations of the Indictment, included quotations of government officials, and, among other things, stated the following with emphasis: "*An indictment is merely an allegation. All defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.*" (Ex. 1.)

     On September 30, 2024, the United States filed with this Court a one-count information charging Defendant Nadarajah's then-employer, TD Securities (USA) LLC ("TD"), with wire fraud based on the same criminal scheme alleged in this case. *See* Information, *United States v. TD Secs. (USA) LLC*, No. 2:24-cr-623 (D.N.J.) (ECF No. 1). Defendant Nadarajah's alleged criminal acts formed the basis for TD's criminal liability because, as that information charges, "[i]n executing the scheme to defraud in connection with the purchase and sale of U.S. Treasuries Products and the placement of Spoof Orders, Nadarajah was acting within the scope of his employment as an

---

[1] The United States presumes the Court's basic familiarity with the allegations of this case and incorporates, rather than repeat, the background laid out in the United States' responses to the Defendant's four prior motions to dismiss. (*See* ECF Nos. 45–48.)

employee of TD and its affiliates and as an agent of TD, and with the intent, at least in part, to benefit TD." *Id.* ¶ 23.

Also on September 30, 2024, the United States filed a Deferred Prosecution Agreement ("DPA") reached with TD in that matter. *See* DPA, *TD Secs. (USA) LLC*, 2:24-cr-623 (D.N.J.) (Sept. 30, 2024) (ECF No. 3). The DPA is mainly composed of the standard template provisions contained in such agreements routinely reached with the Department of Justice. *See id.* As part of the DPA, TD agreed to numerous provisions including: (1) consenting to the filing of the information in this court; (2) agreeing to pay a criminal monetary penalty, composed of a criminal fine, forfeiture, and victim compensation; (3) agreeing and admitting to a statement of facts describing the charged offense; and (4) agreeing to various additional provisions, including a Public Statements provision, and cooperation and disclosure provisions. *See id.*

Around the time the DPA was publicly filed, the Department published two web pages. One was a press release announcing the DPA with TD ("TD Press Release"), which included a basic description of the charges, the DPA's general terms, quotations by officials, and other related information. (*See* Mot., Ex. A.) In providing a basic description of the case, the TD Press release described the facts to which TD admitted in connection with the DPA, indicating it was citing the public record, including TD's admissions in the DPA:

> **According to court documents and admissions**, Nadarajah, a former director and the head of the TD

3

> Securities U.S. Treasuries trading desk, engaged in a scheme
> to defraud in connection with the purchase and sale of U.S.
> Treasuries in the secondary market. . . .

(Mot., Ex. A at 2 (emphasis added).) In the TD Press Release, the first sentencementioning Defendant Nadarajah's name included a hyperlink to the press release for the Defendant's individual case announcing the Indictment (Ex. 1), which included the presumption of innocence language quoted above. (Mot., Ex. A at 1.) Although at the time of publication the TD Press Release did not include the same sentence, when the Defendant filed his Motion, the prosecution team proactively requested that the press office revise its TD Press Release to add in the requested sentence, which was completed prior to the filing of this brief.[2] The revision is reflected in the version attached as Exhibit 2, which is the current version of the TD Press Release online.[3]

The second web page the Department published upon filing the DPA was the Victim Notification Program page concerning the TD DPA and related victim compensation information, included as Exhibit 3 ("Victim Page"). The Victim Page provided similar information about the DPA, including a general description of the factual basis and the DPA's general terms. (*See* Ex. 3.) Upon mention of Defendant

---

[2] Notably, the defense did not request this edit to the press release—or confer with the United States in any way on the substance of this Motion—prior to filing.

[3] *TD Securities to Pay $15.5M in Connection with Scheme to Defraud U.S. Treasuries Markets*, U.S. Dep't of Justice (Sept. 30, 2024), https://www.justice.gov/opa/pr/td-securities-pay-155m-connection-scheme-defraud-us-treasuries-markets (last visited Nov. 4, 2024).

Nadarajah's individual case, the Victim Page again included a hyperlink to the press release announcing Defendant Nadarajah's Indictment (Ex. 1), and stated:

> Nadarajah was charged on November 7, 2023, in a case currently awaiting trial in the District of New Jersey. **An indictment is merely an allegation and all defendants are presumed innocent until proven guilty beyond a reasonable doubt in a court of law.**

(Ex. 3 at 2 (emphasis added).) The Victim Page included similar language a second time, stating:

> <u>Presumption of Innocence</u>: It is important to keep in mind that defendants are presumed innocent until proven guilty and that presumption requires both the court and our office to take certain steps to ensure that justice is served.

(Ex. 3 at 3.)

This Court held an initial appearance in the TD matter on October 9, 2024. At that hearing, the Court asked the United States to "provide in detail as to what we are addressing." (Tr. 4:18–19, *TD Secs. (USA) LLC*, No. 2:24-cr-623 (D.N.J. Sept. 30, 2024) (ECF No. 21) (Ex. 4).) In response to the Court's request and recognizing that the same set of facts underlies the allegations in these two related cases, the undersigned took care to distinguish publicly between the mere *allegations* in this case and the admissions in the TD statement of facts, stating that those facts are "*alleged* in [Defendant Nadarajah's] case and [] agreed to in" the TD case. (*Id.* at 5:1–2 (emphasis added).) The Defendant then filed his Fifth Motion to Dismiss the Indictment, (ECF No. 75), to which the United States, through undersigned counsel, responds.

## Argument

The Court should deny the Defendant's Motion because it seeks to paint the ordinary as exceptional in hope of extraordinary relief. The Defendant makes two general arguments in support of the Motion: (I) pretrial publicity in TD's case irredeemably prejudiced the jury pool for the Defendant's own trial months away; and (II) the routine form and content of TD's DPA constitutes prosecutorial misconduct that prejudices the Defendant, including asserting that the template "Public Statements" provision applicable only to TD and its parent corporation—not the potential witnesses at issue—is "a draconian threat" amounting to "witness interference." (Mot. at 17.)

Stripping the hyperbole shows core premises are false and the conclusions do not follow. Simply: (I) any hypothetical prejudice from pretrial publicity can be explored and, if necessary, cured in voir dire; and (II) the DPA's form and content, consisting largely of routine template provisions, do not amount to prosecutorial misconduct or witness intimidation.

As the Justice Manual makes clear, "[t]he prosecution of corporate crime is a high priority for the Department of Justice" that "promotes critical public interests," including "protecting the integrity of our economy and capital markets by enforcing the rule of law . . . ." § 9-28.010. The United States took action to further those interests in TD's case. The Defendant, without basis, casts these worthy efforts as "the government's deliberate actions to bias any potential jury" in this case. (Mot. at 4.) Not so. Such resolutions are routine, important aspects of the Department's efforts to

address and deter corporate crime, to provide redress to potential victims, and to defend the integrity of U.S. markets critical to the global economy. The Defendant has not—and cannot—make the required showing otherwise. Accordingly, the Court should deny the Motion.[4]

## I.    The Defendant's speculation that pretrial publicity has "irreparably" prejudiced the jury pool is unfounded and premature.

### A. Pretrial publicity legal standard.

The Supreme Court of United States made clear that "'pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial.'" *Skilling v. United States*, 561 U.S. 358, 384 (2010) (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)).[5] Numerous courts agree that "an indictment may not be dismissed due to pretrial publicity . . . without, at a minimum, the Court conducting a voir dire examination of the jury panel at the commencement of trial." *United States v. Whiteside*, 391 F. Supp. 1385, 1387 (D. Del. 1975); *see also United States v. Cerilli*, 428 F. Supp. 801, 807 (W.D. Pa. 1977) ("[D]ismissal of the indictments is not the appropriate result upon a motion to dismiss based upon pretrial publicity, at least until a voir dire may be

---

[4] The defense failed to comply with this Court's Local Rules by using 12-point Times New Roman font in the Motion. *Compare* Mot. *with* D.N.J. L. Civ. R. 7.2(d) *incorporated by* D.N.J. L. Cr. R. 1.1.

[5] This case, among many others cited, similarly involved Department press releases contributing to the pretrial publicity. *See Former Enron Chief Executive Officer Jeffrey K. Skilling Charged with Conspiracy, Securities Fraud, Insider Trading*, U.S. Dep't of Justice (Feb. 19, 2004), https://www.justice.gov/archive/opa/pr/2004/February/04_crm_099.htm (last accessed Nov. 4, 2024).

conducted."), *aff'd on other grounds*, 558 F.2d 697 (3d Cir. 1977); *United States v. Lovecchio*, 561 F. Supp. 221, 229 (M.D. Pa. 1983) (finding "the extreme sanction of dismissal of an indictment is rarely used" in pretrial publicity cases).

Courts, including the Third Circuit, have routinely rejected arguments that pretrial publicity deprived the defendant of a fair trial, even where members of the jury were aware of the pretrial publicity. *United States v. Claxton*, 766 F.3d 280, 298 (3d Cir. 2014) ("The Supreme Court has cautioned . . . that the 'relevant question is not whether the community remembered the case, but whether the jurors at the trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'") (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)); *Martin v. Warden, Huntingdon State Corr. Inst.*, 653 F.2d 799, 806 (3d Cir. 1981) (finding voir dire of potential jurors did not establish actual prejudice from pretrial publicity, even though 71 of 81 venire members said they have been exposed to pretrial publicity, and 23 venire members stated they "formed fixed opinions of [defendant's] guilt," where none of those acknowledging fixed opinions served on the jury); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity.").

As the Third Circuit has explained:

> In a case involving extensive and allegedly inflammatory pre-
> trial publicity, we will find that the trial court abused its
> discretion only when appellants demonstrate clearly that the

> jurors possesses "such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025 (1984). It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurance that they can be impartial. The mere fact that community members are cognizant of the crimes and of the defendants' identities does not, by itself, render the trial constitutionally unfair. Instead, we must examine the totality of the circumstances surrounding the trial for the conjunction of extensive and inflammatory publicity immediately prior to trial, evidence of the community's outrage at the revelation of the crimes, and clear indications of juror partiality on the record, before we can reverse the trial court's finding of jury impartiality for manifest error.

*United States v. De Peri*, 778 F.2d 963, 972 (3d Cir. 1985) (citations omitted) (finding trial court did not abuse its discretion even where "pre-trial publicity was extensive, and there was no 'cooling off' period between the publicity and trial").

"[W]here adequate prophylactic measures are taken, and where the voir dire reveals no hostility that could not be laid aside, a conviction will not be reversed solely because of prior jury exposure to prejudicial news media accounts." *United States ex rel. Trantino v. Hatrack*, 408 F. Supp. 476, 489 (D.N.J. 1976), *aff'd*, 563 F.2d 86 (3d Cir. 1977). Courts can employ cautions in addition to voir dire, like judicial instructions. *See, e.g.*, *Claxton*, 766 F.3d at 299 ("[T]he District Court further protected against potential prejudice by instructing jurors that the defendants were to be presumed innocent until the government was able to prove each defendant's guilt beyond a reasonable doubt, and the jurors were instructed to decide the case based solely on the evidence presented

in the courtroom, disregarding anything that they may have seen or heard prior to trial.").

The Third Circuit has developed "a three step procedure to determine whether publicity during the course of the trial has prejudiced the jury. First, a court determines whether the news coverage is prejudicial. Second, if it is, the court determines whether any jurors were exposed to the coverage. Third, if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality." *United States v. DiSalvo*, 34 F.3d 1204, 1221–22 (3d Cir. 1994) (internal quotations and citation omitted).

As to Department of Justice policy, "[c]ourts have definitively held that criminal defendants cannot obtain dismissal of an indictment for pretrial publicity in violation of the Justice Manual . . . ." *United States v. Parrish*, No. 4:20-cr-124-17, 2022 WL 662306, at *3 (S.D. Ga. Mar. 4, 2022). The Third Circuit is clear that "[s]uch internal guidelines and policies do not create enforceable rights for criminal defendants." *United States v. Ruchlewicz*, 610 F. App'x 204, 205 (2015) (cleaned up); *see also United States v. Grace*, 401 F. Supp. 2d 1057, 1062 (D. Mont. 2005) (stating § 1-7.500 of the Justice Manual is "not enforceable by this Court"). Indeed, the policy itself makes clear that it "provides internal guidance only and does not create any rights enforceable in law or otherwise." U.S. Dep't of Justice, Justice Manual § 1-7.001.

## B. Speculations of prejudice can be addressed in voir dire.

The caselaw is clear that the proper means to explore and, if necessary, address the Defendant's complaints is voir dire. At this juncture, the Defendant's assertions of "severe and irreparable harm," (Mot. at 19.), are entirely speculative and unfounded. And, as the record shows, there is reason to suspect that such harm may not in fact have occurred. *See supra* pp. 2–5. As the TD Press Release and DPA itself make clear, the DPA involves admissions on behalf of only *TD* and TD's parent corporation, not the Defendant or anyone else. And, as the record also shows, the United States took great care in many different places to make clear that the allegations in this case were just that—allegations. *See id.* Even assuming prejudice (which, to be clear, is entirely speculative at this juncture), the Court can easily meet the requirements of the law by questioning potential jurors to determine whether any even saw the coverage and, if so, whether they are able to set aside any prejudgment. *See, e.g.*, *DiSalvo*, 34 F.3d at 1221–22.

A court in this District rejected arguments that pretrial publicity denied the defendant a right to a fair trial where the judge took curative measures including voir dire questions, even where that publicity involved inflammatory accusations of "disarming, then disrobing and finally the executing of two helpless police officers . . . an event that would generate intense publicity . . . ." *Trantino*, 408 F. Supp. at 487. If pretrial publicity involving executing police officers did not hopelessly pollute the jury pool, this surely does not present such a case. *See id.*

Another court in this District denied a motion for a change of venue and a continuance based on adverse pretrial publicity in a case involving "an investigation probing into the existence of organized crime and governmental corruption" resulting in the indictment of "the Mayor of the City of Newark and a number of its public officials." *United States v. Addonizio*, 313 F. Supp. 486, 493 (D.N.J. 1970), *aff'd on other grounds*, 451 F.2d 49 (3d Cir. 1972). The court was "not persuaded" that "extensive and intensive" publicity "necessarily preclude[d] the possibility of selecting a fair and impartial jury for the trial of the indictment." *Id.* "Indeed, it has been recently held that publicity associating criminal defendants with 'the Mafia' is not, per se, prejudicial." *Id.* The court concluded: "To presume, in advance of the voir dire examination of the prospective trial jurors, that the extent of the pre-trial publicity in this case negates the selection of a fair and impartial jury represents a premature and unwarranted supposition. This court is satisfied that a properly conducted voir dire will adequately protect the rights of these defendants to a fair trial." *Id.* at 494.

If "extensive and intensive" publicity with such local significance as the Mayor's alleged connection to the mafia did not preclude the selection of an impartial jury in Newark, the Defendant's case certainly does not preclude the same. *See id.* Even the Defendant opines that "money-laundering allegations"—a hallmark of mafia association—are "far more serious" than the allegations against the Defendant. (Mot. at 16.)

This is not "the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurance that they can be impartial." *De Peri*, 778 F.2d at 972. "In order to invoke [such a] presumption of prejudice, the community and media . . . reaction must have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury. Such cases are exceedingly rare." *Flamer v. State of Del.*, 68 F.3d 736, 754 (3d Cir. 1995) (quotations and citation omitted) (affirming denial of motion for change of venue based on pretrial publicity in death penalty habeas case). The United States is unaware of a case in which the Third Circuit has applied such a presumption. The Supreme Court appears to have done so in only three, "extreme" cases over 57 years ago, none of which remotely resemble this matter.[6]

---

[6] *See Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963). The Court described all three cases in *Skilling v. United States*, 561 U.S. 358 (2010). The Court noted that *Sheppard*, involved "extensive[]" publicity about the defendant "who was accused of bludgeoning his pregnant wife to death." 561 U.S. at 380; *see also Sheppard*, 384 U.S. at 354 (explaining a "carnival atmosphere" pervaded the trial after "months [of] virulent publicity" including "a three-day inquest," during which the defendant "was examined for more than five hours without counsel," that was "televised live" and "ended in a public brawl").

As to *Estes*, the Court explained that "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of the pretrial hearing . . . [leading] to considerable disruption and den[ying] the judicial serenity and calm to which [Estes] was entitled." *Skilling*, 561 U.S. at 379–80 (quoting *Estes*, 381 U.S. at 538).

As to *Rideau*, the Court explained that defendant's confession to murdering a bank employee during a robbery, obtained in jail without an attorney present, was broadcast three times on local television shortly before trial to audiences ranging from 24,000 to 53,000 people in a parish of approximately 150,000. *Skilling*, 561 U.S. at 379.

In contrast, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. 1025, 1029, 1032 (1984).

In some of the most high-profile prosecutions in recent American history, courts have declined even to *transfer venue* (let alone dismiss an indictment) based on pretrial publicity: Dzhokhar Tsarnaev, one of the Boston Marathon bombers;[7] Jeffery Skilling, prominent Enron executive;[8] Ramzi Yousef and others involved in the 1993 World Trade Center bombing;[9] and former Attorney General John Mitchell and others

---

[7] *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (writing, in the case regarding the Boston Marathon bombing, "any high-profile case will receive significant media attention. It is no surprise that people in general and especially the well-informed, will be aware of it. Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process."). In this matter, along with many others cited, a Department press release contributed to the pretrial publicity. *See Suspect in Boston Marathon Attack charged with Using a Weapon of Mass Destruction*, U.S. Dep't of Justice (Apr. 22, 2013), https://www.justice.gov/opa/pr/suspect-boston-marathon-attack-charged-using-weapon-mass-destruction (last accessed Nov. 4, 2024).

[8] *Skilling*, 561 U.S. at 367, 399.

[9] *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (finding, where defendant was involved in the 1993 World Trade Center bombing, and had "negative publicity" that included speculation he "may have been involved in . . . the Oklahoma City bombing," that "the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool").

14

charged as part of the Watergate scandal.[10] In none of those cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' alleged crimes. If the publicity in those prominent cases was not sufficient to require a *transfer of venue even after voir dire*, the pre-voir dire dismissal of this Indictment would be truly extraordinary and contrary to more striking precedent.

In contrast to those cases with greater press in significantly more prejudicial circumstances, the Defendant seizes on the absence of a single sentence again stating the presumption of innocence in the press office's release about the *TD* resolution in the *case against TD* to make a fifth attempt at dismissal. (*See* Mot. at 11.) But the full record shows that the Department repeatedly announced the Indictment in *this* case *against Defendant Nadarajah* contains mere allegations subject to the presumption of innocence. *See supra* pp. 2–5. Nevertheless, in an abundance of caution and to take the issue of a sentence off the table, the prosecution team proactively requested that the press office revise its TD Press Release to add in the requested sentence, which is reflected in the current version online. (*See* Ex. 2.) Thus, where the Defendant's name is mentioned in Department statements regarding these two matters, the caveats are

---

[10] *United States v. Haldeman*, 559 F.2d 31, 64, 70 (D.C. Cir. 1976) (en banc) (holding, where defendants were implicated in the Watergate scandal, that the district court was correct to refuse "pre-voir dire requests for a continuance or a change of venue" and affirming the selection of a jury stating "no one who reads this transcript can fail to be impressed with the patience, attention, and acumen with which the judge probed the opinions of the veniremen so as to remove those who harbored any prejudice or preconception").

present. And, again, any potential prejudice from the absence of a single sentence in a press release about a different case can be explored and cured in voir dire in this matter. There is simply no basis in fact or law for the extraordinary relief the Defendant seeks.[11]

As to this Court's Local Rules, the defense selectively omitted an entire section of the Rule that makes exceptions for the very types of statements at issue here. Specifically, the defense's citation to L. Cr. R. 101.1 included only subsections (a) and (b), which prohibit certain types of extrajudicial statements. (Mot. at 3, 13, 15.) But the defense completely omitted mention of subsection (c), which carves out exceptions, many of which are directly applicable to this case, as it states:

> (c) Notwithstanding L. Cr. R. 101.1(a) and (b), a lawyer involved in the investigation or prosecution of a matter may state without elaboration:
>
> (1) the general nature of a charge or defense;
>
> (2) the information contained in a public record;
>
> (3) that an investigation of the matter is in progress, including the general scope of the investigation, the offense, claim or defense involved and, except when prohibited by law, the identity of the persons involved;
>
> (4) the . . . result of any step in litigation; [and]
>
> . . .

---

[11] The Defendant also strains to bolster his arguments by referencing articles discussing two independent corporate criminal resolutions with different TD entities, involving different facts and different components of the Department of Justice, announced over a week apart. (*See* Mot. at 2.) As with any pretrial publicity, again, any potential prejudice can be explored and, if necessary, cured in voir dire.

> (7) the identity, residence, [and] occupation . . . of the
> accused . . . .

D.N.J. L. Cr. R. 101.1(c). The statements at issue in the TD Press Release fall within these exceptions. Thus, there is no basis for the defense's contention, based on a selective reading of the Rule, that the Department "r[a]n roughshod over the local rules of this Court." (Mot. at 1–2.) Not so.

As to the argument about Department of Justice policy, the law is clear that such internal policies do not create rights for criminal defendants. *See, e.g.*, *Ruchlewicz*, 610 F. App'x at 205; *Parrish*, 2022 WL 662306, at *3. Thus, even assuming for argument the press release previously did not accord with internal DOJ policy (in a manner that is now cured), that does not support the Defendant's requested dismissal. *See id.*

The few cases cited by the Defendant similarly fail to support (and actually undermine) his cause. In the case the Defendant quotes most heavily, *United States v. Splain*, the Eighth Circuit *affirmed* a conviction even where the prosecutor made objectionable statements *to the jury in closing argument* that expressed "his personal opinion of [the] defendant's guilt," which the court found had "no place in a criminal trial." 545 F.2d 1131, 1134–36 (1976). Thus, *Splain* has little relevance to the circumstances here, given that, among other things, there is not yet a jury.

Similarly, in *United States v. Perryman*, the court granted the defendant's "relatively modest" requests to remove from a police office's website quotations of officers describing the defendant as "the worst of the bunch," opining that "many of the guys

we arrested are never going to get out," and stating that "[w]hile we were making arrests, numerous residents . . . came up and thanked us because they feel like a cloud was removed from there. And over the course of the past three years, we've been told that people were afraid to come forth because of the threat of violence from" the defendant. No. 12-cr-123, 2013 WL 4039374, at *13 (E.D.N.Y Aug. 7, 2013). The court denied the defendant's request for an order simply directing the government to comply with a local rule regarding attorney statements given the government's agreement to remove the comments and avoid further similar pretrial publicity. *Id.* In doing so, the court noted that the defendant had "not shown that the press release ha[d] so permeated the public as to have hindered the ability of the Court, probably some six months or more from now, to impanel a fair and impartial jury in this case, especially in light of the size of the jury pool in this huge district and the searching and mitigating tools available to ensure a fair and impartial jury." *Id.* (quotations omitted).

There, as here, the government took steps to address the defendant's concerns. *See id.* This Defendant comes nowhere near the requisite showing to obtain the extraordinary relief of *dismissal* if the *Perryman* defendant, with inflammatory government statements picked up in the press, did not make a showing sufficient for a simple order directing the government to comply with a local rule. *See id.* Other cases cited by the Defendant on this point are similarly inapposite. *E.g.*, *United States v. Wecht*, 484 F.3d 194, 205–06 (3d Cir. 2007) (directing district courts to apply local rules "to prohibit only speech that is *substantially likely* to *materially prejudice* ongoing criminal

proceedings" and noting the ABA had abandoned a lower "reasonable likelihood" standard (emphasis added)).

Put simply, neither the law nor the facts support the Defendant's requested relief, which this Court should deny. Any hypothetical prejudice from pretrial publicity can be explored and, if necessary, cured in voir dire.

## II.    The TD DPA and its common provisions do not violate the Constitution or amount to prosecutorial misconduct.

### A. A deferred prosecution agreement is similar to a plea agreement and is a common device in corporate criminal prosecution.

A "deferred prosecution agreement is analogous to a plea bargaining agreement."

*United States v. Garcia*, 519 F.2d 1343, 1345 & n.2 (9th Cir. 1975). As one court explained:

> The concept is simple: The government intends to prosecute a defendant for criminal wrongdoing, but decides that the defendant is worthy of a chance at rehabilitation and avoiding the collateral consequences that accompany a criminal conviction. Rather than seeking a conviction through trial or guilty plea, the government agrees to defer prosecution for a period of time during which the defendant will be monitored for compliance with various conditions, in an attempt to assess the defendant's rehabilitation. If the defendant succeeds, the government does not prosecute. If the defendant does not succeed, the government may prosecute.

*United States v. Saena Tech Corp.*, 140 F. Supp. 3d 11, 12–13 (D.D.C. 2015). Deferred prosecution agreements, and other forms of corporate resolutions, are routinely reached while cases against individual employees remain pending, including in prior

spoofing cases.[12]

Such agreements are analogous to plea agreements criminal cooperators routinely sign that often include specific statements of fact implicating co-defendants and require the cooperators to testify against co-defendants in criminal trials. *E.g.*, *United States v. Phillips*, 874 F.2d 123, 131 n.8 (3d Cir. 1989) ("[T]here is precedent for a defendant to plead guilty after jury selection and later testify against his co-defendants without cause for a mistrial."); *United States v. Ramirez*, No. 12-cr-10089-03, 2019 WL 3801676, at *3 (D. Kan. Aug. 13, 2019) (describing how co-defendant testified to "his guilty plea, his adoption of a statement of facts incriminating Defendants, and his commitment to testify against Defendants; and that the government could renege if it did not like his testimony").

---

[12]  *See, e.g.*, *Deutsche Bank Agrees to Pay over $130 Million to Resolve Foreign Corrupt Practices Act and Fraud Case*, U.S. Dept. of Justice (Jan. 8, 2021), https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-over-130-million-resolve-foreign-corrupt-practices-act-and-fraud; *JP Morgan Chase & Co. Agrees to Pay $920 Million in Connection with Schemes to Defraud Precious Metals and U.S. Treasuries Markets*, U.S. Dept. of Justice (Sept. 29, 2020), https://www.justice.gov/opa/pr/jpmorgan-chase-co-agrees-pay-920-million-connection-schemes-defraud-precious-metals-and-us; *Merrill Lynch Commodities Inc. Enters into Corporate Resolution and Agrees to Pay $25 Million in Connection with Deceptive Trading Practices Executed on U.S. Commodities Markets*, U.S. Dept. of Justice (June 25, 2019), https://www.justice.gov/opa/pr/merrill-lynch-commodities-inc-enters-corporate-resolution-and-agrees-pay-25-million.

**B. Witness interference constituting prosecutorial misconduct requires a strong showing of actions taken with deliberate intent to distort the judicial factfinding process that actually prejudice the defendant.**

The Third Circuit reviews such witness interference claims under the standard for prosecutorial misconduct. *See United States v. Quinn*, 728 F.3d 243, 258 (3d Cir. 2013) (en banc). The court has "defined prosecutorial misconduct as actions taken 'with the deliberate intention of distorting the judicial factfinding process.'" *Id.* (quoting *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978)). The court explained:

> This deliberate distortion test applies when the Government has taken steps to interfere with the testimony of a witness who would otherwise be available to the defense. For example, the prosecution has engaged in misconduct if the defendant can show that the Government's "[i]ntimidation or threats . . . dissuade[d] a potential witness from testifying"—that is, "the Government's conduct . . . 'substantially interfered' with a witness's choice to testify."

*Id.* (quoting *Lambert v. Blackwell*, 387 F.3d 210, 260 (3d Cir. 2004)).

"Critically, [defendants] must show that the prosecutorial misconduct will 'infect[] the trial with unfairness' tantamount to 'a denial of due process.'" *United States v. Santos*, No. CR 18-585, 2022 WL 1698171, at *11 (D.N.J. Mar. 22, 2022) (quoting *Marshall v. Hendricks*, 307 F.3d 36, 64 (3d Cir. 2002)). "[C]ourts counsel that those bringing prosecutorial-misconduct claims face a '**substantial burden**' . . . ." *Id.* (emphasis added) (quoting *United States v. Yu Xue*, No. 16-22, 2018 WL 3647900, at *6 (E.D. Pa. Aug. 1, 2018)). "Although courts should protect against deliberate wrongdoing by prosecutors, and in those rare cases where it arises, overzealous

advocacy that distorts the factfinding function of a criminal trial, they should be hesitant, absent a strong showing by the defense, to determine that the Government has engaged in misconduct." *United States v. Evans*, No. 3:CR-19-09, 2021 WL 5847134, at *11–12 (M.D. Pa. Dec. 9, 2021) (quotations omitted).

In addition to making a strong showing of deliberate intent, the Defendant must show that (1) he was actually prejudiced and (2) dismissal is the only available remedy. *See, e.g.*, *United States v. Wright*, 913 F.3d 364, 371–71 (3d Cir. 2019) ("[A] court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice."); *United States v. Derrick*, 163 F.3d 799, 808 (4th Cir. 1998) ("[V]irtually every other circuit to consider the issue . . . has also held that an indictment may not be dismissed based on prosecutorial misconduct, absent a showing of prejudice to the defendant.").

As this Court recognized in the context of a *Brady* violation, "dismissal of an indictment with prejudice is only *potentially* available in cases of deliberate misconduct by the government which resulted in substantial prejudice to the defendant." *United States v. Jafari*, No. 12-cr-475, 2012 WL 5335242, at *2 (D.N.J. Oct. 26, 2012) (Cecchi, J.). "Moreover, as the Third Circuit noted in *Fahie*, 'in all jurisdictions, dismissal with prejudice is in practice a rare sanction for any constitutional violation.'" *Id.* (quoting *Gov't of the V.I. v. Fahie*, 419 F.3d 249, 254–55 (3d Cir. 2005)).

### C. The DPA and its routine contents do not violate the Constitution or amount to prosecutorial misconduct.

The TD DPA is composed of mostly routine template provisions found in many (if not most or all) of the deferred prosecution agreements recently reached with the Department of Justice, including the agreements cited in the Defendant's Motion.[13] These template provisions do not violate the Constitution. Nor can the Defendant show, as required, a deliberate intent to distort the factfinding process in this case by the Department entering a routine DPA with TD—because there was no such intent. To suggest this routine happening is "a draconian threat" amounting to "witness interference," (Mot. at 20), is hyperbolic and incorrect.

---

[13] See, for example the cases cited in Motion note 12:

- DPA, *United States v. Freepoint Commodities LLC*, No. 23-cr-224 ¶¶ 5, 26 (D. Conn. Dec. 14, 2023) (containing substantially similar public statements and cooperation provisions), *available at* https://www.justice.gov/opa/media/1329266/dl;

- DPA, *United States v. Deutsche Bank Aktiengesellschaft*, No. 20-cr-584, ¶¶ 5, 26 (E.D.N.Y. Jan. 7, 2021) (containing substantially similar public statements and cooperation provisions in a spoofing case), *available at* https://www.justice.gov/opa/press-release/file/1360741/dl;

- DPA, *United States v. Goldman Sachs Grp. Inc.*, No. 20-cr-437, ¶¶ 5, 23 (E.D.N.Y. Oct. 22, 2020) (containing substantially similar public statements and cooperation provisions in the agreement discussed *infra* pp. 24–25), *available at* https://www.justice.gov/usao-edny/press-release/file/1329961/dl;

- DPA, *United States v. JPMorgan Chase & Co.*, No. 20-cr-175, ¶¶ 5, 30 (D. Conn. Sept. 29, 2020) (containing substantially similar public statements and cooperation provisions in a spoofing case), *available at* https://www.justice.gov/opa/press-release/file/1320576/dl.

The Defendant takes issue most prominently with the "Public Statements" provision of the DPA, which, again, is routine in these agreements. *See supra* at 21, n.12. The DPA's Public Statements provision provides:

> **The Company [TD] and TDGUS [TD's parent company]** expressly agree that they shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company or [TD's parent company] make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility **by the Company [TD]** set forth above or the facts described in the Statement of Facts . . . . If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section shall so notify the Company [TD] and [TD's parent company], and **the Company [TD] and [TD's parent company] may avoid a breach of this Agreement by publicly repudiating such statement(s)** . . . .

DPA, ¶ 28 (emphasis added).

As evident from the text, the Public Statements provision requires TD (and TD's parent company) not to make statements *on behalf of TD* (or its parent) contrary to the DPA or its statement of facts as a condition of obtaining the benefits of the DPA. *See id.* Importantly, the Public Statements provision binds *only TD and TD's parent corporation*—not anyone else, including the individuals who may testify in this case. *E.g.*, *Holves v. Ferguson*, 3:20-cv-05718, 2021 WL 1601310, at *5 (W.D. Wash. Feb. 17, 2021) ("[A] plea agreement, under federal law, is contractual in nature. Like any other contract, it is not binding on a non-party to the contract." (citations omitted)). Neither TD nor

its parent company are expected witnesses or parties to this litigation; thus, the provision is not implicated in this case.

The scope of the provision is further clarified by the text allowing TD to repudiate any statement by an individual that is contrary to the DPA. *See id.* Thus, the Public Statements provision reflects the recognition that others may make different statements, but that those statements would not be TD's and would not be imputed to TD unless adopted by TD. The text makes abundantly clear that the Public Statements provision does not apply to individuals who may testify under oath in this trial. *See id.*

A court addressed this issue head on regarding the deferred prosecution agreement related to the widely publicized 1Malaysia Development Berhad ("1MDB") case, rejecting similar arguments by an individual defendant. In *United States v. Hwa*, the defendant was a former banker at Goldman Sachs facing charges related to the 1MDB scandal. No. 18-cr-538, 2021 WL 11723583, at *1–2 (E.D.N.Y. Sept. 3, 2021). During the pendency of the defendant's case, Goldman reached a deferred prosecution agreement with the government. The agreement included many of the same provisions as the DPA in this case, including a substantially identical public statements provision (termed a "Silence Provision" by that defendant) and a cooperation provision. *Id.* at *39. In the defendant's omnibus motion to dismiss, he moved only to modify certain provisions of Goldman's agreement, including the Silence Provision. *Id.* at 39–40. The defendant argued that the Silence Provision "interfere[d] substantially with . . . witness's

free and unhampered choice to testify and violate[d his] fundamental right to establish a defense by presenting witnesses." *Id.* at *40 (internal quotations omitted).

The court rejected these arguments, finding the defendant failed to show witness intimidation.[14] *Id.* at *42. The court explained that "the Silence Provision only binds the Goldman Sachs Group and does not control the behavior of individual employees . . . ." *Id.* The court also found that the defendant failed to show bad faith on the part of the government and "merely speculate[d] that the DPA will encourage untruthful testimony at trial, which is insufficient." *Id.* The court noted that the defendant could not show prejudice "as a trial is yet to begin." *Id.* The court also rejected the defendant's challenge to the agreement's cooperation provision, finding that the defendant had the tools available to him to compel witnesses to provide testimony, that the provision contained "standard language that is routinely included in prosecution agreements," and did not offend the defendant's constitutional rights. *Id.* at *44–46.

Similarly, in *United States v. Stein* the court denied the defendant's motion to dismiss the indictment arguing that aspects of the deferred prosecution agreement reached between the government and his prior employer "constitute[d] prosecutorial

---

[14] The court rejected the defendant's claims under both a constitutional standard and the Second Circuit's three-prong test, which requires a defendant to show "(1) that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means, (2) bad faith on the part of the government, and (3) the absence of fundamental fairness infected the trial." *Hwa*, 2021 WL 11723583, at *41, 43 (citing *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019) (internal quotations omitted)).

misconduct and deprive[d] the movant of rights under the Fifth and Sixth Amendments." No. 05-cr-0888, 2006 WL 1063295, at *1 (S.D.N.Y. Apr. 5, 2006). A "central part of the deal" with which the defendant took issue was the company's "admission of the accuracy of a Statement of Facts that was made part of the [agreement]." *Id.* The defendant also took issue with a cooperation provision, and a provision nearly identical to the Public Statement provision here, which stated that the company: "shall not, through its attorneys, agent, partners, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement." *Id.*

The court rejected the defendant's arguments that these provisions interfered with his constitutional rights. *Id.* With respect to the equivalent of the Public Statements provision, the court wrote that, though the provision is broad: "the government has a legitimate interest in seeing to it that [the company] not gain the benefit of deferred prosecution, only to undermine its formal acceptance of guilt by making statements inconsistent with it. Such behavior would threaten to make a mockery of our criminal justice system." *Id.* The court also emphasized that the statements provision applied to the company, not individual employees, writing:

> The DPA does not purport to control the actions of individuals. What it requires is that [the company], upon notice from the government and in order to avoid imputation of a statement to it, promptly disavow any assertion by an affiliated individual that is inconsistent with the Statement of Facts. The government expressly disavows any intention of using this provision to pressure individuals,

> directly or through the agency of [the company], to testify in any particular way or to limit access by the defense to potential witnesses. . . . Thus, there is no basis to suppose that the DPA provisions in question will be used to retaliate against [the company] should any of its employees cooperate with the defense in any appropriate way. In other words, the Court has no reason to believe that the government does not fully appreciate the difference between appropriate action to ensure that [the company] does not undermine its admission of guilt, on the one hand, and utterly intolerable interference with the defense of this case, on the other.

*Id.* at *2. So too here.

The *Stein* court also addressed and rejected the defendant's concern that that specter of the agreement would cause that company or its employees "to avoid anything during the deferral period that could give the government cause for unhappiness." *Id.* The court found these concerns unpersuasive because they were "speculative" and noted that an attempt by the company to interfere with any voluntary cooperation with the defense could result in prosecution of offending individuals or the firm. *Id.*

This Court should follow the path paved by the courts in *Hwa* and *Stein* and reject the Defendant's urgings to chart a new course contrary to precedent. The provisions under consideration in those cases were substantially similar (indeed, functionally identical) to those in the TD DPA with which the Defendant takes issue. As those courts recognized, the Defendant's concerns are "speculative" and unfounded. *See id.*

The DPA is analogous to ordinary plea agreements with individuals, which routinely include both (i) factual bases the defendants declare as truthful and (ii) agreements not to testify falsely in contravention of those true admissions. *See, e.g.,*

*Phillips*, 874 F.2d at 131 n.8; *Ramirez*, 2019 WL 3801676, at *3. In those instances, as in this, it is the parties to the agreement that are bound by their terms, not other parties who may be related to the litigation (*i.e.*, co-defendants). *E.g.*, *Ferguson*, 2021 WL 1601310, at *5. The situation here is once removed from those, given that TD is not expected to testify and the potential witnesses themselves are not parties to TD's DPA. Again, the Defendant spins a routine occurrence as extraordinary in search of an exceptional, unwarranted remedy.

The scant caselaw cited by the Defendant does not counsel otherwise. For example, in *United States v. Morrison*, the Third Circuit vacated a conviction and remanded for a new trial where the prosecutor engaged in a "highly intimidating personal interview" of a prospective defense witness in which the prosecutor repeatedly warned the witness about perjury charges for false testimony in a manner that was "completely unnecessary." 535 F.2d 223, 227 (1976). The witness refused to testify and the court found that the prosecutor's interference with the prospective defense witness denied the defendant a fair trial. *Id.*

*Morrison* is obviously distinct from this case, as there has been no such "highly intimidating personal interview" of prospective defense witnesses and no showing by the Defendant that the government's actions have denied him potential testimony. *See id.* Further, the remedy in *Morrison*—a new trial—was far less severe than the remedy of dismissal the Defendant requests here. *See id.*; *see also Fahie*, 419 F.3d at 254–55.

The remainder of the Defendant's complaints about the DPA are similarly unavailing. For example, the Defendant protests that his conduct is the only conduct described in the DPA, that "100% of TD's criminal liability stems from Mr. Nadarajah's actions," and that the Defendant's name is mentioned more than TD's in the DPA statement of facts. (Mot. at 16.) But the alleged facts are what they are. TD's liability is premised on the Defendant's acts while employed at TD through the principle of respondeat superior. *See, e.g.*, *United States v.* Sain, 141 F.3d 463, 475 (3d Cir. 1998) ("[A] corporation is a conspirator only pursuant to respondeat superior liability."). Thus, it is no surprise that the facts alleging the Defendant's liability in this case are the facts to which TD admitted on its own behalf in the DPA in its own case.

As to individuals' choice of counsel, the United States has no control over whom individuals choose to represent them. The Defendant does not make an argument or even speculation about the effect of common counsel; he simply implies that he suffers prejudice without basis or citation. (*See* Mot. at 17.) Despite asserting that prejudice is at an "absolute maximum," the Defendant fails to establish any actual prejudice at all. (*See id.*) This is particularly true because the Defendant will be able to cross-examine witnesses to explore any speculative prejudice or biases as a result of common counsel or the TD DPA.

In short, the Defendant cannot make the required "strong showing" of deliberate intent to distort the judicial factfinding process, because there was no such intent. Nor can the Defendant make any required showing of prejudice at this juncture. Nor has

the Defendant shown, as required, that no less severe remedy is available to address any actual prejudice. *See Wright*, 913 F.3d at 371–71. The Defendant does not state, let alone meet, these applicable standards, and invites this Court to err in granting relief without support in the law. *See id.* The Motion amounts to a series of speculations the Court should reject.

## Conclusion

The Court should deny the Defendant's Fifth Motion to avoid trial on the merits because it seeks extraordinary relief unsupported by fact or law.

Dated: November 4, 2024

Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section
Criminal Division, Department of Justice

*/s/ John J. Liolos*
John J. Liolos, Trial Attorney
Amanda Fretto Lingwood, Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Tel.: (202) 768-2246
john.liolos@usdoj.gov

**<u>Certificate of Service</u>**

I hereby certify that on November 4, 2024, I will cause the foregoing motion to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide copies to counsel for all parties.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 4, 2024

_/s/ John J. Liolos_
John J. Liolos, Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section